UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROCCO TERRANOVA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )   **09 C 3027** |
| | ) |
| SHEET METAL WORKERS INTERNATIONAL | )   **Judge John W. Darrah** |
| ASSOCIATION, SHEET METAL WORKERS' | ) |
| LOCAL UNION NO. 73, THOMAS BUREK, | ) |
| ROBERT SCHNEIDER, DANIEL AHERN, and | ) |
| ROBERT BERNACKI, | ) |
| | ) |
| Defendants. | ) |

## LOCAL 73'S
## MEMORANDUM OF LAW ON SUBJECT MATTER JURISDICION

Defendants Sheet Metal Workers' Local Union No. 73, Thomas Burek, Robert Schneider, and Daniel Ahern (collectively, "Local 73"), by their attorneys Daley and George, Ltd., submit this memorandum of law on subject matter jurisdiction and move to dismiss plaintiff's complaint, stating as follows:

### 1.     Background

Sheet Metal Workers' Local Union No. 73 is a local labor union with over of 5,000 members and with a geographic jurisdiction of Cook and Lake Counties, Illinois. Local 73 held a Nomination Meeting on May 1, 2009, (see Complaint ¶ 56), at which time candidates for union office were officially nominated and at which time nominations were officially closed. (SMWIA Constitution Article 12, Section 4.)[1]  A notice of election, as required by 29 U.S.C. § 481(e), was mailed to the membership on May 8, 2009, a copy of which is attached as Exhibit B. Pursuant to that notice, Local 73's election is to be held on June 6, 2009.

---
[1] A copy of the SMIWA Constitution is attached as Exhibit A.

## 2. Procedural history

Plaintiff was, on February 28, 2009, charged with violations of the SMWIA Constitution that included improperly obtaining and distributing a local union credit card number and the credit card number of an affiliated union trust fund. (See Complaint ¶ 34; see also Exhibit C) On April 24, 2009, plaintiff received a written decision from an International Trial Board of the Sheet Metal Workers' International Association ("SMWIA") which found him guilty violating the SMWIA Constitution and, as part of the resulting discipline, removed him from his union office and barred him from holding office for approximately one year. (See, e.g., Complaint ¶¶ 51, 53; see also Exhibit D.) On April 28, 2009, plaintiff both appealed the decision and requested a 'stay' of his ineligibility for office. The SMWIA's General Executive Council denied his request for a stay on May 1, 2009, (see Complaint ¶ 55; see also Exhibit E.), although his appeal to the General Executive Council is pending, (see Complaint ¶ 54), and is expected to be heard in the first week of August 2009.

While those adverse decisions occurred on April 24, 2009 and May 1, 2009, plaintiff noticed an 'emergency motion' for a temporary restraining order for May 27, 2009, just 10 days before the election.

## 3. The court lacks subject matter jurisdiction, or alternatively it has no power to grant the relief requested by plaintiff because of the pendency of the election

Federal district courts are courts of limited jurisdiction; "[t]hey possess only that power authorized by Constitution and statute." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (7th Cir. 2005) (quoting Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994)). The burden of establishing jurisdiction lies with plaintiffs. Transit Express, Inc. v. Ettinger, 246 F.3d 1018, 1023 (7th Cir. 2001).

2

The inquiry into subject matter jurisdiction necessarily begins with the Labor-Management Reporting and Disclosure Act of 1959 (the "LMRDA" or "Act"), also commonly referred to as the Landrum-Griffin Act.

*Title I* of the LMRDA is the union worker's 'bill of rights,' and includes safeguards for union member freedom of speech (LMRDA § 101(a)(2), 29 U.S.C. § 411(a)(2)) and against improper disciplinary action (LMRDA § 101(a)(5), 29 U.S.C. § 411(a)(5)).[2] These guarantees are generally enforced by bringing a private action in federal court. 29 U.S.C. § 412. It should be noted that § 411(a)(2), which provides for the right of free speech, conditions it by stating that "nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2); see also 29 CFR 452.50.

*Title IV* of the LMRDA, in contrast, regulates elections for union offices and provides for various voting rights.[3] The Supreme Court has held that Congress's intent in enacting Title IV was "not to permit individuals to block or delay union elections by filing federal-court suits for violations of Title IV." Calhoon v. Harvey, 379 U.S. 134, 140 (1964). Instead, the statute requires the investigation of any Title IV claim by the Secretary of Labor after the election takes place. 29 U.S.C. § 482. If the Secretary of Labor finds probable cause to believe that a violation of Title IV has

---

[2] LMRDA § 609, 29 U.S.C. § 529 provides similar safeguards with respect to union discipline for rights granted under the LMRDA.

[3] Title IV's 29 U.S.C. § 481(e) provides in relevant part as follows:
> (e) Nomination of candidates; eligibility; notice of election; voting rights; counting and publication of results; preservation of ballots and records. In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. Not less than fifteen days prior to the election notice thereof shall be mailed to each member at his last know home address….The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this title.

occurred, then it is up to the Secretary to bring a civil action against the labor organization to set aside the results of the election. Id. Moreover, 29 U.S.C. § 483 provides that this remedy is exclusive.

As the Seventh Circuit has noted, "the rights enumerated in Titles I and IV of the LMRDA are not neatly compartmentalized into separate and distinct categories." Chao v. Local 743, Teamsters, 467 F.3d 1014, 1021 (7th Cir. 2006). Instead, it is well recognized that Title I and Title IV protect many of the same rights with respect to union elections. Id. However, if a lawsuit alleges Title I violations but is, in effect, a Title IV suit, the suit has been improperly brought, and a district court has no jurisdiction over the action. Bradley v. American Postal Workers Union, 962 F.2d 800, 802 (8th Cir. 1992).

In Calhoon v. Harvey, 379 U.S. 134 (1964), for example, there was a pre-election challenge to several union rules that controlled eligibility to run and nominate others for union office. The plaintiffs in Calhoon asked the court to enjoin the union from preparing for or conducting the election. The Court first concluded that in substance the claims (basically relating to eligibility of candidates for office) alleged violations of Title IV rather than Title I. The Court then held that the District Court could not invoke its jurisdiction under Title I to hear Title IV claims. The Court relied for its conclusion on Congress' intent "to allow unions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts." Calhoon, 379 U.S. at 140.

In Driscoll v. Int'l Union of Operating Engineers, Local 139, 484 F.2d 682 (7th Cir. 1973), the plaintiff (who refused to sign a non-Communist affidavit) claimed that he was denied the right to run for union office as a punishment for exercising his right to free speech as guaranteed by § 411(a)(2). Recognizing the "broad mandate" of Calhoon, (id. at 987), the court nevertheless held

that the fact that the question of the plaintiff's eligibility for office fell squarely within Title IV of the Act.

Even if a plaintiff's purported Title I claims do not fully infringe on Title IV (thereby completely depriving a court of subject matter jurisdiction), a court's ability to grant relief in a Title I case is limited because Title I's enforcement mechanism, 29 U.S.C. § 412, only permits a district court to grant such relief "as may be appropriate." 29 U.S.C. § 412. This limitation is even more curtailed in the context of an election and the looming shadow of Title IV. Relevant to that analysis is Local No. 82, Furniture & Piano Moving v. Crowley, 467 U.S. 526 (1984). In Crowley, the plaintiffs claimed that restricting admission to a nominations meeting to those members who could produce computerized dues receipts violated their equal rights to nominate candidates under 29 U.S.C. § 411(a)(1) and for failure to recognize an individual as a candidate for a specific office. Crowley, 467 U.S. at 530-31. The district court had issued a temporary restraining order (and later a preliminary injunction), presuming that jurisdiction was available under 29 U.S.C. § 412 for claims alleging discriminatory application of union rules. Id. at 532. Ultimately the Supreme Court granted *certiorari*, "[b]ecause of the confusion evident among the lower federal courts that have tried to reconcile the remedial provisions under Title I and Title IV of the Act," (id. at 534-35), and reversed the decision. After reviewing the legislative history and the interaction between Title I and Title IV, the court held that whether a Title I suit may properly be maintained by individual union members during the course of a union election depends upon the nature of the relief sought by the Title I claimants. More specifically, the Supreme Court felt itself "compelled to conclude that Congress did not consider court supervision of union elections to be an 'appropriate' remedy for a Title I suit filed during the course of a union election." Id. at 545-46. "In sum, whether suits alleging violations of Title I of the LMRDA may properly be maintained during the course of a union election depends upon the appropriateness of the remedy required to eliminate the claimed statutory violation. If the

5

remedy sought is invalidation of the election already being conducted with court supervision of a new election, then union members must utilize the remedies provided by Title IV." Id. at 550.

With respect to the Local 73 election, nominations have been held (and closed), the required § 481(e) notice of election has been sent, and voting takes place on June 6. Because Local 73 is in the course of a union election, Title IV at best curtails the court's ability to provide a remedy, and at worst divests the court of jurisdiction. For example, in Mayes v. Int'l Union of Operating Engineers, Local 106, 642 F. Supp. 968 (N.D. N.Y. 1986), the plaintiffs alleged violations of Title I of the LMRDA and sought preliminary injunctive relief requiring the union to modify the ballots (specifically, to remove certain candidates) prepared for an upcoming election. Id. at 969. The nomination meeting had been held, the plaintiffs had filed suit on August 14, 1966, and the election was scheduled for August 26. On August 25 the court issued its opinion from the bench (memorialized a few days later in a written decision). Id. at 970. The court noted that the plaintiffs were not seeking to enjoin the election, but only sought to have the ballots changed prior to the election. Id. at 970. Even so, the court found that it lacked jurisdiction:

> Before considering the merits of the plaintiffs' claims, the Court must first determine whether it has the authority under the LMRDA to grant the relief requested by the plaintiffs prior to the upcoming election. In its effort to resolve this issue, the Court has been guided by the principles enunciated by the Supreme Court in [Crowley]. On the basis of those principles, the Court concludes that even if the plaintiffs had established their right to injunctive relief…it would be inappropriate at this time for the Court to grant the relief requested.
> …
> The issue before the Court in the present case is essentially the same as that addressed by the Supreme Court in [Crowley], namely, whether during the course of a union election, a federal district court can entertain a suit alleging violations of Title I of the LMRDA. In the opinion of this Court, [Crowley] stands for the proposition that the Court has subject matter jurisdiction under 29 U.S.C. § 412 to entertain the suit, but *the Court's authority to grant relief is somewhat circumscribed by the policy considerations underlying Title IV of the LMRDA. Thus, even when Title I violations are alleged and proven, the Court may only grant such relief as is appropriate to remedy the statutory violation and under no circumstances is invalidation of a pending election and court supervision of a new election an appropriate remedy.*
> …

> …In dismissing the plaintiffs' claims, the Court wishes to point out that it is doing so because the relief sought by the plaintiffs is not "appropriate within the meaning of 29 U.S.C. § 412.

Id. at 970-71 (emphasis added).

As a result, the Mayes court denied the plaintiffs' motion and dismissed the action. Id. at 971.

The plaintiffs in Bishop v. Duval, 592 F. Supp. 16 (S.D. N.Y. 1984), also sought a preliminary injunction with respect to the conduct of a pending election. In Bishop, the court was asked to intervene in a local union's election of delegates to an international union's general convention. Bishop, 592 F. Supp. at 17-18. More specifically, the plaintiffs sought to enjoin the defendants from holding their international union's general convention unless and until the procedural errors that plaintiffs perceived in delegate representation and voting were remedied. See id. at 18. The Bishop court determined that it was confronted with an ongoing election – "an integral part of the process of electing union officers." Id. at 18. The court, "[a]ssuming without deciding" that the plaintiffs stated a Title I claim (which the defendants disputed), held that it was without jurisdiction over the suit and that plaintiffs were relegated to the exclusive remedies provided by Title IV of the LMRDA. Id.

In Colgan v. Carey, No. 94 C 5685, 1995 WL 88974 (N.D. Ill. Feb. 24, 1995), Judge Coar faced plaintiffs who sought a declaration that they should not be disqualified (due to suspensions) as potential candidates in an upcoming election. The plaintiffs claimed that their suspensions were a purely political act to prevent their candidacies. In analyzing various provisions of the LMRDA, Judge Coar specifically found that it was inappropriate for him to address their § 411(a)(5) claims:

> To remedy the plaintiffs' alleged violation of Title I rights and thereby preserve their rights under Title IV to be declared eligible candidates for the upcoming election, this court would have to determine whether plaintiffs were subject to an improper disciplinary action under section 101(a)(5) [29 U.S.C. § 411(a)(5)]. This would certainly be a significant undertaking. The remedy sought by plaintiffs clearly falls outside of the limited parameters for affording Title I relief established in Crowley.

Colgan v. Carey, No. 94 C 5685, 1995 WL 88974 at *9 (N.D. Ill. Feb. 24, 1995).

A case cited by plaintiff, Schonfeld v. Penza, 477 F.2d 899, 900 (2nd Cir. 1973), has been recognized by Driscoll as a narrow exception to the 'broad mandate' of Calhoon, only where a purposeful program of suppressing dissent is in place. Driscoll, 484 F.2d at 687. Such a 'purposeful program' is not present in this case. Although plaintiff's motion (but not his complaint) claims that the disciplinary action against him is a part of a history of conduct in Local 73, plaintiff cites only one prior charge (from 2003) and does not claim that the Local 73 Defendants were parties to that dispute.

**4.      Plaintiff has not exhausted internal remedies, nor should they be disregarded**

Plaintiff should not be allowed to skirt the requirement of exhaustion of internal remedies. It is true that requiring exhaustion of internal administrative processes is in the discretion of the trial judge, Giordani v. Upholsterers Intern. Union of North America, 403 F.2d 85 (2nd Cir. 1968); Pearl v. Tarantola, 361 F. Supp. 288, 292 (S.D.N.Y.1973), and plaintiffs who have demonstrated that appellate review would be futile in the face of existing bias at the appellate level have been excused from exhaustion of these internal appeals. Johnson v. General Motors, 641 F.2d 1075 (2d Cir.1981). But plaintiff has not made such a showing in this case. Even in the case cited by plaintiff, Schonfeld v. Penza, the plaintiff had fully exhausted his administrative remedies. Schonfeld v. Penza, 477 F.2d 899, 900 (2nd Cir. 1973.)

There is no defect or bias in the SMWIA appeal process. The SMWIA Trial Board that conducted plaintiff's hearing consisted of a local union Business Manager from San Antonio, Texas, a local union Business Manager from Tulsa, Oklahoma, and a local union Business Manager from Detroit, Michigan, none of whom had any involvement in Local 73 matters.

As plaintiff himself acknowledges, he still has a pending appeal before the SMWIA's General Executive Council. (Complaint, ¶ 54.) That appeal will be heard in the first week of August 2009, when the General Executive Council meets next.[4]

The SMWIA's appeal process is working exactly as the framers of its constitution envisioned it should. Plaintiff will receive a full hearing before the SMWIA's General Executive Council, as he requested. For that appeal hearing he was provided an opportunity to submit additional evidence and testimony in the form of affidavits (which he declined to do) is exercising his right to appear personally before the General Executive Council. (See SMWIA Constitution Article 19, Sections 3(a), 3(b).) The appeal will be decided by 10 local union Business Managers from throughout the United States and Canada, with Thomas Burek participating only as a charging party.[5]

Another remedy for plaintiff would be to contest the election with the SMWIA General President, using procedures under SMWIA Constitution Article 12, Section 6(e). If appropriate, the SMWIA General President could order a new election.

**5.     Plaintiff's motion fails to satisfy the requirements for a preliminary injunction.**

A preliminary injunction is an *extraordinary* remedy that is only granted where there is a clear showing of need. Cooper v. Salazar, 196 F.3d 809, 813 (7th Cir. 1999). "A preliminary injunction may be issued only if the moving party demonstrates some likelihood of success on the merits, an inadequate remedy at law, and irreparable harm if denied." Indiana Civil Liberties Union v. O'Bannon, 259 F.3d 766, 770 (7th Cir. 2001). "If these elements are demonstrated, the court must balance the irreparable harm the nonmovant will suffer if relief is granted and the irreparable harm to

---

[4] Further, should the decision of the General Executive Council not be to his liking, he can proceed to the next tier of his appeal rights, which is an appeal to the SMWIA's General Convention, which will consists of delegates from local unions across the United States and Canada.

[5] Should he need and desire to do so, plaintiff could even pursue a second level of appeal before the SMWIA's International Convention, consisting of delegates from local unions across the United States and Canada. (SMWIA Constitution Article 19, Section 4.)

9

the movant if relief is denied. The court must also consider the public interest in either the grant or denial of the relief." Id. at 770.

### a. Plaintiff is not likely to succeed on the merits.

Plaintiff cannot simply cry 'free speech' and emerge victorious. The fact that a union election is pending does not graft an improper motive onto the Local 73's actions. Plaintiff fails to allege that any discipline was a result of his speech.

For example, plaintiff alleges in paragraph 16 of his complaint that "he spoke to numerous members who encouraged him to run against Burek." But plaintiff does not allege that any of the defendants knew about those conversations. Similarly, plaintiff alleges in paragraph 17 of his complaint that "[o]ne of the issues that Terranova discussed with union members was that Burek had spent too much money on certain union related matters, including, but not limited to, the annual holiday party for Local 73 officers (to which rank and file members were not invited." But again plaintiff does not allege that the defendants knew about those conversations. Similar allegations of 'free speech' disconnected from any connection to the defendants are made in paragraphs 18, 21, 22, 28, and 31. Throughout his complaint plaintiff simply pleads circumstantial connections and "pretext," which would be a weak footing indeed on which to found a temporary restraining order.

Plaintiff does allege, in paragraph 29 of the complaint, that member Eric Olson spoke up at a union meeting regarding an inquiry over billings by The Clubhouse, however Eric Olson – who is also a candidate – was never charged or the subject of union discipline.

The charges themselves do not reference plaintiff's speech – or anyone else's speech for that matter. (See Exhibit C.)

The Seventh Circuit has noted that "[j]udicial review of union disciplinary proceedings is limited….[Section 411(a)(5)] does not require the 'full panoply of procedural safeguards found in criminal proceedings. Under [Section 411(a)(5)] the evidence is sufficient if the charging party

provides some evidence at the disciplinary hearing to support the charges made. Further, the courts cannot determine the scope of offenses warranting discipline." Gustafson v. Amer. Train Dispatchers' Assoc., AFL-CIO, 788 F.2d 1284, 1287 (7th Cir. 1986) (internal quotations and citations omitted).

Here there was a two-day hearing, with several witnesses on both sides and literally dozens of exhibits. As indicated below, there was evidence to support the charges made.

> i. **Plaintiff was legitimately charged, found guilty, and disciplined for his improper handling of improperly obtained documents relating to The Clubhouse – including most importantly Local 73's credit card number**

Although provisions from the transcript[6] of the hearing could be cited and quoted at length, this brief will attempt to focus on the gravamen of plaintiff's misconduct – his distribution of Local 73's credit card number to third parties.

Plaintiff admitted at the hearing that he received on his home fax machine "a fax from the Clubhouse with a contract and bill and everything." (Transcript, p. 40, lines 23-24.) Plaintiff acknowledged that those documents included Local 73's credit card number. (Transcript, p. 711, lines 13-21; Transcript, p. 724, lines 1-2.) Plaintiff admitted at the hearing that he gave Michael May the fax, again including Local 73's credit card number. (Transcript, p. 707, line 16.) At the hearing a witness testified that at his place of employment he saw an associate of plaintiff showing materials from The Clubhouse that included Local 73's credit card number. (Transcript, p. 291, lines 18-21.) Plaintiff's *own* witness at the hearing, Eric Olson, who received at least two copies (with Local 73's credit card number) from May (see Transcript, p. 423, lines 20-23), retained a copy at the time of the hearing (Transcript, p. 450, lines 12-13), and upon realizing the import of having Local 73's credit card number stated that his "stomach is turned in knots because…that's very damaging" and that he

---

[6] Portions of which are attached as Exhibit F.

11

thought it was "wrong for me to have this in my possession at this time." (Transcript, p. 455, lines 19-24; p. 456, line 1.)

Anyone knows better than to pass out someone else's credit card number. Plaintiff's misconduct giving rises to the charges and discipline is basically as simple as that.

It will come as no surprise that the SMWIA Constitution contains a provision making it a violation to commit "any act of…misappropriation, or appropriating to his or her own use any…property, or thing of value belonging to…any local union." (SMWIA Constitution, Article 17, Section 1(i).) The SMWIA Trial Board obviously found that Local 73's credit card was property or a thing of value, and held plaintiff responsible for its appropriation. So, there was clearly evidence to support a violation of Article 17, Section 1(i), discrediting plaintiff's claims of pretext.

> ii. **Plaintiff was legitimately charged, found guilty, and disciplined for his improper handling of improperly obtained documents relating to Morton's Steakhouse – including most importantly the JATC's credit card number**

Plaintiff admitted at the hearing that he received on his fax machine materials from Morton's Steakhouse. (Transcript, p. 42, lines 11-20.) Plaintiff claimed that he only received two pages from Morton's, (see, e.g., Transcript, p. 42, lines 11-20; p. 515, lines 17-19.), but that claim was contradicted by documentary evidence in the form of fax machine 'activity report' from Morton's indicating that a 5-page fax was sent to plaintiff. (See Transcript, pp. 313-314.) Morton's Steakhouse is a third party service provider (annually) of the union's Joint Apprenticeship Training Committee (the "JATC"). Plaintiff admitted at the hearing that he provided the Morton's documents to his associate John Gritsuk. (Transcript, p. 43, line 11.) At the hearing a witness testified that at his place of employment he saw John Gritsuk showing materials from Morton's that included the JATC's credit card number. (Transcript, pp. 294-297.)

The SMWIA Constitution contains a provision making it a violation of the Constitution to commit "any act of…misappropriation, or appropriating to his or her own use any…property, or thing of value belonging to…any fund or committee administered or trusteed in whole or in part by a local union." (SMWIA Constitution, Article 17, Section 1(i).)  As indicated above, there was clearly evidence to support a violation of this provision.

Based on the above, there was sufficient evidence of the violations to support the hearing decision.  Plaintiff engaged in misconduct and was properly charged and disciplined – his claims of free speech notwithstanding.[7]

### b. Plaintiff has an adequate remedy at law.

Plaintiff has not demonstrated an inadequate remedy at law, in that Title IV provides him with a statutory basis to file and pursue a post-election complaint with the Secretary of Labor.  See 29 U.S.C. § 482.  Should it become involved, the Department of Labor could if necessary seek a new election for the benefit of plaintiff.  Contrary to his assertions, plaintiff would not have to wait three years to run again.

### c. Plaintiff cannot show irreparable harm.

If the election proceeds without plaintiff on the ballot there will be no irreparable injury because if plaintiff ultimately prevails the results of the election can be voided and another election held.

For example, plaintiff still has his pending appeal with the SMWIA General Executive Council, which has not been given the opportunity to run its course.  Plaintiff can also contest the

---

[7] While disclaiming any intent to curtail protected speech, Local Defendants submit that "The Seventh Circuit has not addressed the question of whether the plaintiff must demonstrate the protected expression played a 'substantial role' or merely a 'role' in the retaliatory action."  Kauffman v. IBEW, Local 461, 124 F. Supp. 2d 1127, 1131 fn.1 (N.D. Ill. 2000).

election with the SMWIA General President, using procedures under SMWIA Constitution Article 12, Section 6(e), which could result in a new election for the benefit of plaintiff.

Furthermore, plaintiff has – and knows he has – an adequate remedy in the form of a post-election Title IV complaint. Courts have held that the availability of a Title IV remedy is enough to demonstrate that a plaintiff has no irreparable harm. For example, in Sheldon v. O'Callaghan, 335 F. Supp. 325 (S.D. N.Y. 1971), the plaintiffs sought to restrain the mailing of proposed ballots to insure that their campaign literature would be received in advance of the ballots. The Sheldon court first noted that a preliminary injunction is an extraordinary remedy, granted only in the court's discretion upon a clear demonstration of both probable success and irreparable injury. The court then observed that the "LMRDA provides for post-election remedies, so as to prevent blocking or delaying of Union elections while affording adequate relief through enforcement by the Secretary of Labor." Id. at 328. The court then noted that the intent of Congress in establishing post-election remedies was to allow the labor organization full scope to review its own election after it had taken place, after many pre-election grievances had resolved themselves by the results of the election. Based on available post-election remedies, the Sheldon court held that the plaintiffs had not met their burden of showing irreparable injury in light of the enforcement procedures within 29 U.S.C. § 482, and therefore denied the request for a preliminary injunction.

### d. The balance of hardship weighs against an injunction or other interference with the union election.

Even if plaintiff had been able to satisfy the threshold elements necessary for a preliminary injunction, the hardships to Local 73 would tip the balance towards denial of plaintiff's motion.

Judicial intervention just days before the election would inevitably result in a delay of the election. Insertion of plaintiff onto the ballot might require a rearrangement of candidates on his own 'team,' which would in turn require a new nomination meeting to be held, which would require

advance notice and, as a consequence, a delay in the election. The denial of a timely election is also a detriment to the entire membership of Local 73.

There are currently 47 candidates on the ballot, all of whose interests would be impacted, and several of whom are not affiliated with either plaintiff or the Local 73 defendants. For example, some of those non-affiliated candidates have sent campaign literature mailings to Local 73's thousands of members, at significant expense.

Further, election notices (sent pursuant to 29 U.S.C. § 481) have already been sent out, (see Exhibit B) and if a delay results it is questionable whether there would be sufficient time to send cancellation notices (which would also be an added expense). Regarding the election itself, expenses have already been incurred, and a delay of the election would result in cancellation fees with the election services provider. Nor is it the purpose of a preliminary injunction to give a plaintiff the final remedy that he or she seeks.

It is also highly doubtful that a timely election could be run with court intervention, in that a new ballot would have to be prepared and printed (again at added expense).

With respect to plaintiff, any hardship is minimal. Perhaps first and foremost, there is more than one mechanism for a rerun of the election should he somehow prevail. If he somehow were to be placed on the ballot now, he would no doubt complain that he was running under a 'cloud' as the result of his discipline and again challenge the election if he were to loose. By the same token, adding plaintiff on the ballot at this point might be perceived by the membership as a 'cloud' on the Local 73 defendants.

That the balance of hardships weighs in favor of Local 73 is also evidenced by plaintiff's timing in bringing this action; plaintiff received the decision of the SMWIA Trial Board on April 24, 2009, but rather than act immediately Plaintiff sat on his rights until now, just days before the election. Plaintiff's emergency is one of his own making.

### e. The public interest would be served by the denial of a preliminary injunction.

Granting injunctive relief will harm the public interest because, as the Seventh Circuit has recognized, there is an "expressed policy…against judicial interference with internal union affairs." Grant v. Chicago Truck Drivers, 806 F.2d 114, 118 (7th Cir. 1985).

In the same vein, in enacting Title IV and its enforcement provision, Congress expressed an "intent to consolidate challenges to union elections with the Secretary of Labor and to have the Secretary supervise any new elections necessitated by violations of the Act." Crowley, 467 U.S. at 543. The Court in Calhoon specifically discussed the public interest:

> It is apparent that Congress decided to utilize the special knowledge and discretion of the Secretary of Labor *in order to best serve the public interest*…In so doing, Congress…decided not to permit individuals to block or delay union elections by filing federal-court suits for violations of Title IV. Reliance on the discretion of the Secretary is in harmony with the general congressional policy to allow unions great latitude in resolving their own internal controversies, and , where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts.

Calhoon v. Harvey, 379 U.S. 134, 140 (1964) (emphasis added).

Title IV's special function in furthering the overall goals of the LMRDA is to insure 'free and democratic elections. Crowley, 467 U.S. at 539 (internal citations omitted).

The public interest is best served by permitting the voters to choose their representatives for now and dealing with the aftermath (should that really be necessary) under the expertise of the Department of Labor.

For all the reasons stated above, the public interest would not be served by the disruption of a union election. Because of the need for a new nomination meeting, a delay would result in the election, depriving members of their right to an election. In addition, placing plaintiff on the ballot now would hardly serve the public interest if he is later found to be legitimately barred from holding

office, as is likely. Nor does it serve the public interest to bow to what are effectively the conspiracy theories of a lone member who has already admitted to releasing union credit card numbers.

**6. Incorporation by reference**

Local 73 incorporates by reference the arguments made by the Sheet Metal Workers' International Association in its brief filed concurrently with this brief.

**7. Conclusion**

For the reasons stated above, the Court should rule that it lacks subject matter jurisdiction, deny plaintiff's motion for injunctive relief, and dismiss plaintiff's complaint with prejudice.

**WHEREFORE,** Defendants Sheet Metal Workers' Local Union No. 73, Thomas Burek, Robert Schneider, and Daniel Ahern, respectfully request that this Court deny plaintiff's motion for injunctive relief and dismiss with prejudice plaintiff's complaint.

    Respectfully Submitted,

    Sheet Metal Workers' Local Union No. 73,
    Thomas Burek, Robert Schneider, and Daniel Ahern

    By: /s/ Richard Toth
        One of Their Attorneys

DALEY AND GEORGE, LTD.
*Attorneys for Defendants*
20 S. Clark St., Suite 400
Chicago, IL 60603
(312) 726-8797